# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

KRISTIE M. SMITH,               )
                                     )

       Petitioner,               )
                                     )

v.                              )       No.    3:19-CV-066-RLJ-DCP
                                     )

TRINITY MINTER,                 )
                                     )

       Respondent.               )

## <u>MEMORANDUM OPINION</u>

After hearing evidence that Petitioner shot Curtis Phoenix ("the victim"), who was Petitioner's boyfriend and the father of one of her children, in the head five times while he was sleeping, a jury convicted her of first-degree murder. *State v. Smith*, No. E2010-00549-CCA-R3-CD, 2011 WL 551176446, at *1–5 (Tenn. Crim. App. Nov. 14, 2011), *perm. app. denied* (Tenn. Jan. 14, 2014) ("*Smith I*"). Petitioner, a state prisoner, has filed a pro se petition for habeas corpus relief under § 2254 challenging this conviction, and a memorandum in support thereof [Docs. 1, 2]. In these filings, Petitioner does not dispute her responsibility for the victim's death but claims that evidence was insufficient to support her first-degree murder conviction, that the trial court's admission of her jail phone calls and letters was improper and violated her constitutional rights, that her trial counsel and appellate counsel provided ineffective assistance, and that illegal actions of her trial judge denied her a fair and impartial trial [*Id.*]. Respondent filed a response in opposition to the petition [Doc. 14], and the state court record [Docs. 11, 15]. Petitioner did not file a reply, and her time for doing so has passed [Doc. 20].

After reviewing the relevant filings and the state court record, the Court finds that the evidence was sufficient to support Petitioner's first-degree murder conviction, Petitioner has not

established that the admission of her jail phone calls and letters violated any constitutional right or that her trial or appellate counsel was ineffective, and Petitioner procedurally defaulted her claims regarding the misconduct of her trial judge. Thus, Petitioner is not entitled to relief under § 2254, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the habeas corpus petition will be **DENIED**, and this action will be **DISMISSED**.

## I. BACKGROUND

The Tennessee Court of Criminal Appeals ("TCCA") summarized Petitioner's state court criminal trial and motion for new trial proceedings as follows:

> [Petitioner] and the victim, Curtis Phoenix, lived together in a trailer park on Holston Drive in Knoxville. The victim was a known drug dealer. [Petitioner] had four children, the youngest of which was fathered by the victim. [Petitioner]'s two daughters, ages 4 and 6, were in the custody of [Petitioner]'s grandmother, Linda Estridge.
>
> On Sunday, January 14, 2007, the victim took [Petitioner] to Ms. Estridge's residence to visit her daughters. At some point, [Petitioner] left there and went to her mother's boyfriend's house, where she smoked crack cocaine with her mother, Sherry Agee. Ms. Agee took [Petitioner] home around 7:30 p.m. When they arrived, the victim was upset. Ms. Agee testified that the victim did not approve of [Petitioner] smoking crack, and that he could tell Ms. Agee was "high." She heard [Petitioner] and the victim argue, and she heard the victim tell [Petitioner] to "hit the road with the babies." [Petitioner] called Ms. Agee later that night at around 10:00 or 10:30 p.m. [Petitioner] said that she was taking one of her sons to the emergency room and asked if Ms. Agee would go with her. [Petitioner] arrived at her mother's house driving the victim's Jeep Cherokee, which the victim did not allow her to drive. [Petitioner] also had the victim's cell phone, cash and crack cocaine. [Petitioner] never took either of her sons to the emergency room. Rather, [Petitioner] and Ms. Agee took the children to Ms. Estridge's house, and [Petitioner] and Ms. Agee then drove around and rented a motel room at the Red Carpet Inn, where they smoked crack cocaine together. [Petitioner] was crying, but she did not tell her mother what was wrong. They left the motel and went to Western Heights Apartments, where they continued to smoke crack cocaine. The next morning, as Ms. Agee was leaving the apartments, she was stopped in the alley by police and arrested for trespassing and being in possession of crack cocaine. She

2

did not hear from [Petitioner] again until the following day. [Petitioner] called Ms. Agee on Tuesday evening, and Ms. Agee was concerned for her daughter.

Linda Estridge, [Petitioner]'s grandmother, testified that on Sunday evening, the victim had brought [Petitioner] to her house. [Petitioner]'s mother picked her up and later took her back home. [Petitioner] called her that night and told her that the victim was angry because [Petitioner] had been with her mother. [Petitioner] asked Ms. Estridge to talk to the victim. Ms. Estridge talked to the victim, and the victim threw down the phone. Ms. Estridge then heard what sounded like someone being pushed into the refrigerator. On Wednesday morning, January 17th, Ms. Estridge picked up [Petitioner] from Western Heights Apartments and took her to the trailer where [Petitioner] and the victim lived. Ms. Estridge testified that [Petitioner] went inside and came back out with a basket of CDs and a DVD player and asked if she knew anyone who wanted to buy them. Ms. Estridge took [Petitioner] back to Western Heights Apartments. Ms. Estridge testified that [Petitioner]'s behavior was "erratic, very nervous, [and] agitated." [Petitioner] began crying and "broke down" and told Ms. Estridge that she had shot the victim. Ms. Estridge drove back to [Petitioner]'s trailer and looked through the window. She saw the victim lying on the couch, covered by a blanket, and she called the police.

Kimberly Price of the Knoxville Police Department took photos of the crime scene. She testified that there was blood pooled around the victim and blood splatter around the victim. She found spent shell casings and bullets around the area where the victim's body was and an empty gun holster in the victim's bedroom. She also found a receipt from McDonald's and a McDonald's bag in the trash.

The medical examiner, Darinka Mileusnic–Polchan, testified that she examined the victim's body at the crime scene. There were blankets and pillows covering his head and body, and they appeared to be clean. There was blood on the sofa, wall and floor around the body. The body had been there for several days and was decomposing. [The victim] had been shot five times in the top of the head and the side of the face and neck. She testified that he did not die immediately, and that there was a time period between having been shot and dying in which he aspirated on his own blood. She examined the victim's stomach contents and found food matching that on the receipt from McDonald's. She testified that the victim had eaten within an hour before the shooting. She did not find any evidence of a struggle. She recovered a bullet from the victim's jaw and a bullet jacket fragment from his brain. The evidence did not suggest that the shots were fired from within three feet. A toxicology report concluded that [the victim] did not have drugs or alcohol in his system at the time of his death.

Allen Norris lived across the street from [Petitioner] and the victim and worked with the victim. He knew the victim sold marijuana and crack cocaine, and he testified that the victim kept marijuana in his freezer. He testified that [Petitioner] had made an allegation in October, 2006, that the victim, a former boxer, had punched her twice in the face, but he never saw her with bruises or a black eye. He never saw the victim abuse [Petitioner] or her children. He testified that the victim did not show up for work on Monday, January 15th, and [Petitioner] called and left a message that the victim had fallen and broken his ankle and she was taking him to the hospital. Mr. Norris saw [Petitioner] two days later getting into her grandmother's van with a stack of DVDs. He asked her which hospital the victim was at, and [Petitioner] told him that she had dropped off the victim at Baptist. She then stated that the victim was at St. Mary's Hospital.

Julie Campbell testified that she met [Petitioner] for the first time while Ms. Campbell was at Western Heights Apartments. She testified that they smoked a "large quantity" of crack cocaine together. [Petitioner] had "thousands" of dollars in cash and a large amount of crack. [Petitioner] told Ms. Campbell that she had shot and killed the victim and taken his money, drugs, and guns. [Petitioner] told her that she had shot him in the head while he was sleeping, covered his head with a pillow and shot him three more times in the head. [Petitioner] said that she had put the two guns she used, a .380 and a .45 caliber pistol, into a diaper bag and threw them out close to East Town Mall. [Petitioner] told Ms. Campbell that three days after the shooting she had called her grandmother to come get her and take her back to her trailer to get the victim's DVDs and marijuana. Ms. Campbell testified that [Petitioner] did not appear remorseful at all, but that she began crying after she ran out of crack cocaine.

On Wednesday, January 17, 2007, Officer Jonathan Chadwell was dispatched to the Western Heights Apartments to look for [Petitioner]. When he found [Petitioner] she gave him a false name, being the name of one of her daughters. [Petitioner] did not have any money or drugs in her possession.

Arthur Parris, an employee of the Knoxville Utilities Board, found a bag on the side of the road near East Town Mall at approximately 1:00 p.m. on January 17, 2007. He stopped and opened the bag and found two handguns inside. The guns were cocked and loaded. Mr. Parris called the police.

Police did not find any latent fingerprints on the guns. Patty Resig, of the Knoxville Police Department forensic unit, examined a .380 caliber handgun and a .45 caliber handgun, and the casings and bullets recovered from the crime scene. She determined that a .45 caliber cartridge case and two .380 caliber shell casings were fired from the pistols. There were two .45 caliber bullets and two .380 caliber

bullets that she could not positively identify as having been shot from the handguns, but they all had the same class characteristics and some individual characteristics.

Following her arrest, [Petitioner] wrote a letter dated February 21, 2007, to Kendrick Hughes. [As introduced at trial, t]he letter states:

> Things are not looking good for me. [] I'll be lucky to get second-degree because of the bullets went in execution style. So I'm going to tell them some shit to get heat of passion crime. Shit, you know, a bitch got to do what a bitch got to do to get back to her young'ns. For example, I might say he slept with someone who had AIDS or something and told me to deal with it. Wouldn't that make you made enough to kill? I know it would me.

[Petitioner]'s probation officer, Tara Richardson, testified that she was aware of a domestic assault by the victim against [Petitioner]. She testified that [Petitioner] was "obviously afraid" of the victim. [Petitioner] had told her that the victim had abused her while she was pregnant. She last met with [Petitioner] on January 5, 2007. [Petitioner] was scheduled to meet with Ms. Richardson on January 16, 2007, but [Petitioner] did not show up.

In another letter written by [Petitioner] from jail to Kendrick Hughes on February 5, 2007, which was introduced during the States rebuttal, [Petitioner] wrote:

> I'm a bad ass white girl posted on your block. When you see me coming through, I'll be slinging them rocks. Bitch, don't get me twisted because I ain't no fucking cop, and I've always got a stash of that perp in my socks.

> When I'm rollin' in the hood, I'll be on them 22s, and if you step up to me, I'll make your blood spill. Always what you think. I've got skills. They are just a little rusty.

*Motion for New Trial*

At a hearing on [Petitioner]'s motion for new trial, [Petitioner]'s trial counsel testified that he had been a practicing attorney in Tennessee for 13 or 14 years, and that his only area of practice was criminal defense. Counsel was appointed to represent [Petitioner] in January, 2007. Counsel met with [Petitioner] in jail. Counsel was aware that [Petitioner] had a history of drug use, specifically crack cocaine, and that she did not have a high school education. Counsel agreed to waive [Petitioner]'s preliminary hearing in general sessions court in exchange for "open file discovery" by the prosecutor. Counsel viewed a videotaped interview by

detectives of Linda Estridge, [Petitioner]'s grandmother, in which Ms. Estridge described [Petitioner] as bipolar. Counsel was also aware that [Petitioner] had requested to see the jail psychiatrist to obtain medication, and in a letter she wrote, she stated that she would lie in order to get medication. Counsel was not aware of [Petitioner]'s medical or psychiatric history involving suicide attempts, hospitalizations, and depression, and he did not request [Petitioner]'s medical records. Counsel did not file a motion to have [Petitioner] evaluated to determine her competency to stand trial. Counsel testified that he never suspected that [Petitioner]'s mental health might be an issue because she never exhibited any signs or behaviors that would so indicate.

Counsel filed pretrial motions seeking to exclude from evidence [Petitioner]'s phone calls from jail. Counsel also sought to exclude letters written by Defendant while in jail. Counsel specifically objected to the portion of one of the letters written by [Petitioner], which states: "Things aren't looking good for me. My lawyer said I'd be lucky to get second degree because one of the bullets went in execution style." Counsel argued that by allowing into evidence what a defendant claims her attorney advised her would potentially compromise the attorney/client relationship. The trial court agreed and redacted the phrase "[m]y lawyer says" from the letter that was introduced into evidence. Counsel did not believe the letter created a conflict of interest requiring his withdrawal as counsel. Counsel's theory of defense at trial was that [Petitioner] was abused by the victim and that the shooting was done in the heat of passion. In preparation for trial, counsel interviewed potential witnesses, but determined that those witnesses would be more harmful than helpful to [Petitioner]'s case. Counsel acknowledged that the proof of abuse was weak. Counsel attempted to have [Petitioner]'s letters from jail excluded and was successful in excluding several, but one letter was ultimately admitted as rebuttal to Ms. Estridge's testimony that [Petitioner] was a "good girl."

Psychologist Kathryn Smith testified that she was contacted by [Petitioner]'s post-trial counsel to evaluate [Petitioner]. She prepared a report based on her evaluation. In preparing her report, Dr. Smith obtained [Petitioner]'s medical records dating back to age 11. [Petitioner] had been diagnosed with "depression and psychotic disorder, not otherwise specified." [Petitioner]'s medical records revealed that just days prior to the offense, [Petitioner] had reported "homicidal ideation and major depression" at a postpartum checkup. Dr. Smith testified that [Petitioner] had responded well to medications prescribed to her after the conviction.

Dr. Smith diagnosed [Petitioner] with "bipolar disorder" and testified that her mental state at the time of the offense could have prevented her from forming premeditation and intent. Dr. Smith also testified, however, that in her reports, she concluded that "[Petitioner] was not a reliable informant during the forensic

6

interview and testing"; that she "over[ ]reported and exaggerated her symptoms and problems in the MMPI II, and she exaggerated and fabricated symptoms on the MPS"; and that [Petitioner]'s letters and phone calls from jail do not "corroborate [her] description of her mental state at the time of the offense." Based on two psychological tests administered by Dr. Smith and all of the information she reviewed, Dr. Smith found evidence that [Petitioner] was malingering or exaggerating her psychological problems.

Dr. Smith testified on cross-examination as follows:

> Q: And, again, just to be clear, sitting here today, can you say that at the time of the offense that Ms. Smith could not form the intent to commit premeditated first-degree murder?
>
> A: I can't say. The best I can do is say that what I said in my report which is "could have," and the—I think it—it goes back to "free from excitement and passion." And so I—really the best I could do is say that having bipolar disorder and untreated bipolar disorder, being under the influence of substances, that could preclude somebody from being able to premeditate.
>
> Q: Okay. And, again, that is if she was under the influence of—of a narcotic. If there was no proof that she was under the influence of narcotics, then how would that impact your decision?
>
> A: Well, she still has raging bipolar disorder. It's—it's very possible for somebody with bipolar disorder to not [sic] reflect and make a judgment. There's—like I said earlier, there's the impulse and the action and nothing in between, and so that—that could be there whether they have influence of drugs and alcohol or not. I mean, that's—you know, that's kind of a known issue with bipolar disorder.
>
> Q: I guess let me ask it like this. Just because a person has bipolar disorder does that prevent them from committing an intentional act?
>
> A: No, it does not.

Regarding the offense, [Petitioner] told Dr. Smith that she and the victim had been arguing and she became very upset. She stated that she got one of the victim's guns from the bedroom and attempted to shoot herself, but the gun did not fire because the safety was on. She then began firing in the direction of the room where the victim was sitting on the couch eating his food. Dr. Smith acknowledged that the

crime scene photographs and diagram were not consistent with [Petitioner]'s account of what happened.

Attorney James Logan testified as an expert in criminal law. Mr. Logan testified that he was contacted by [Petitioner]'s post-trial counsel to give an opinion regarding trial counsel's performance at trial. Mr. Logan testified that he believed that the evidence at trial did not support trial counsel's theory that [Petitioner] was a "battered woman," and therefore, counsel's presentation of the theory to the jury was damaging to [Petitioner]'s case. Mr. Logan testified, "it's obvious in this case that [trial counsel] did not have a position relative to this case that would be supported by the evidence...." He also testified that counsel's failure to develop at trial [Petitioner]'s mental health history and substance abuse at the time of the offense was deficient. Mr. Logan believed that, based on the evidence, the only viable defense in this case was that of diminished responsibility. He met with [Petitioner] and, based on his observations, determined that she had "classic symptoms of what I call 'bipolar dysfunction.'" Mr. Logan testified that trial counsel's failure to request a jury charge on intoxication was also deficient.

Mr. Logan believed that [Petitioner]'s letters from jail created a conflict of interest because she attributed certain statements to her trial counsel. He explained that [Petitioner]'s reference to a "heat of passion" defense without the reference to her trial counsel created the impression that [Petitioner] was making up a defense. In Mr. Logan's opinion, the decision to redact the phrase "[m]y lawyer says" adversely affected [Petitioner]'s case.

*Smith I*, at *1–5.

## II. PROCEDURAL HISTORY

After the jury convicted Petitioner of first-degree murder [Doc. 11-1 p. 40], she filed a motion for new trial and a number of amendments/supplements to that motion raising various claims, including claims for ineffective assistance of counsel, and the trial court denied that motion after a hearing [Doc. 11-1 p. 41–42, 52–53, 54–91; 107–14; Doc. 11-2 p. 6–13, 51; Doc. 11-7]. Petitioner then filed a direct appeal challenging her conviction and the denial of her motion for new trial [Doc. 11-14], and the Tennessee Criminal Court ("TCCA") affirmed both. *Smith I*.

Petitioner next filed a pro se petition for post-conviction relief asserting many claims, including a claim that the misconduct of her trial judge denied her a fair trial [Doc. 11-21 p. 4–13].

8

Through counsel, Petitioner filed an amendment to this petition that included a claim that her appellate counsel was ineffective for not filing an application for a Rule 11 appeal of the TCCA's opinion affirming her conviction and the denial of her motion for new trial with the Tennessee Supreme Court ("TSC"), and allegations that the in-court misconduct of the trial judge amounted to structural error [*Id.* at 26–31].

The post-conviction court granted Petitioner a delayed application for a Rule 11 appeal to the TSC [*Id.* at 33–34], and the TSC denied review [Doc. 11-20]. The post-conviction court then dismissed the rest of Petitioner's post-conviction petition, finding that all claims therein were waived or previously determined [*Id.* at 41–43]. The TCCA affirmed this dismissal, and the TSC denied review. *Smith v. State*, No. E2017-02344-CCA-R3-PC, 2018 WL 4031056 (Tenn. Crim. App. Aug. 23, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018) ("*Smith II*").

Petitioner next filed the instant § 2254 petition [Docs. 1, 2].

## III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") allows a federal court to grant habeas corpus relief on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts." *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant

habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold") (citing *Williams*, 529 U.S. at 410). Rather, this Court may grant relief for a claim decided on its merits in state court only where the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Also, before a federal court may grant habeas corpus relief, the petitioner must have first exhausted her available state remedies by "fairly present[ing]" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 302–03 (1984)). In Tennessee, presentation of a claim to the TCCA is sufficient. Tenn. S. Ct. R. 39.

If a petitioner never presented a claim to the highest available state court and a state procedural rule now bars presentation of the claim, the petitioner procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32, 750 (1991). Such a claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 2074, 2080 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted"). Tennessee petitioners may generally proceed only through one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule).

Procedural default may also occur when a petitioner presented the claim to the highest state court but that court could not "reach[] the merits of the petitioner's claim" because the petitioner failed to comply with an applicable state procedural rule, which is regularly enforced and an independent state ground that supports the judgment. *Walker v. Martin*, 562 U.S. 307, 315 (2011).

A federal district court may review a procedurally defaulted claim only where the petitioner shows cause for the default and actual resulting prejudice, or that failure to address a claim would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991); *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90–91 (1977). A petitioner may establish "cause" by showing that some objective external factor impeded his counsel's ability to comply with state procedural rules, or that trial counsel rendered ineffective assistance. *Coleman*, 501 U.S. at 753–54. And the prejudice required to overcome a default must have "worked to [Petitioner's] *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Also, a fundamental miscarriage of justice occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Thus, such a claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial" to overcome a procedural default. *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## IV.   ANALYSIS

### A.  Sufficiency of the Evidence

Petitioner first claims that the evidence was insufficient to support her first-degree murder conviction by asserting that she had no premeditation to kill the victim but rather acted in self-defense and/or as "a Battered Woman" [Doc. 1 p. 5–6; Doc. 2 p. 1–3]. In its opinion affirming

this conviction, the TCCA described the elements of first-degree murder and the required premeditation for such a conviction under Tennessee law as follows:

> First degree murder is "[a] premeditated and intentional killing of another [.]" Tenn. Code Ann. § 39–13–202(a)(1). "Premeditation" is defined in our criminal code as:
>
>> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
>
> *Id.* § 39–13–202(d).
>
> Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. *See State v. Suttles,* 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland,* 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Pike,* 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. *Jackson,* 173 S.W.3d at 409; *State v. Thacker,* 164 S.W.3d 208, 222 (Tenn. 2005); *Leach,* 148 S.W.3d at 54; *Nichols,* 24 S.W.3d at 302; *Bland,* 958 S.W.2d at 660.

*Smith I,* at *6.

The United States Supreme Court's decision in *Jackson v. Virginia,* 443 U.S. 307 (1979), provides the controlling rule for Petitioner's claim challenging the sufficiency of the evidence to support her first-degree murder conviction under § 2254. *See Gall v. Parker,* 231 F.3d 265, 287–88 (6th Cir. 2000), *superseded on other grounds by Parker v. Matthews,* 567 U.S. 37 (2012). In *Jackson,* the Supreme Court held that the evidence is sufficient to sustain a conviction if, viewing

the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. In making this determination, the district court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

A federal habeas court reviewing the sufficiency of the evidence must apply two levels of deference. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). First, under *Jackson*, the court gives deference to the verdict "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (citing *Jackson*, 443 U.S. at 324 n.16); *see also Cavazos v. Smith*, 565 U.S. 1, 6–7 (2011) (providing that "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*, 443 U.S. at 326). The habeas court must give additional deference to the state court's consideration of the verdict under the AEDPA's highly deferential standards. *Cavazos*, 565 U.S. at 6 (noting the double deference owed "to state court decisions required by § 2254(d)" and "to the state court's already deferential review"). As such, a petitioner challenging the evidence against her "bears a heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986).

Petitioner raised a claim challenging the sufficiency of the evidence to support her first-degree murder conviction in her direct appeal to the TCCA, which cited *Jackson* and various state court cases before analyzing this claim as follows:

> Viewed in the light most favorable to the State, the evidence established that [Petitioner] shot the unarmed victim five times in the head while he was sleeping. She admitted the shooting to at least two people. The medical examiner opined that the shooting was "overkill" and that any one of the shots would have killed the

13

victim. [Petitioner] left the house with [the victim]'s money, drugs and vehicle. [Petitioner] disposed of the guns used to commit the murder on the side of the road and lied to police about her identity. She also called the victim's employer and gave a false story explaining his absence from work. [Petitioner] used all of the money and drugs she took from the trailer and went back two days later to get more of the victim's property to sell or trade for drugs.

[Petitioner] made several incriminating statements from jail. In one call, she berated her grandmother for having talked to investigators and demanded that she change her story at the preliminary hearing. In another call to her mother, she threatened to incriminate Ms. Estridge as an accessory to the murder. [Petitioner] expressed no remorse for the killing. In one call, she asked if there was a lot of blood in the trailer. Then she remarked that she "shot him with a .45 with hollow tips" and laughed. In a letter [Petitioner] wrote from jail, she indicated that she was going to lie in order to get the charge reduced from first degree murder.

We conclude that the evidence at trial is sufficient to support [Petitioner]'s conviction for first degree premeditated murder. [Petitioner] is not entitled to relief on this issue.

*Smith I*, at *6–7.

In her petition, Petitioner specifically claims that "[t]here was no premeditation in this heat of the moment, kill or be killed situation" [Doc. 1 p. 4–5]. And in her memorandum supporting her petition, Petitioner claims that she had no premeditation to kill the victim but rather was "a Battered Woman acting in self-defense," and that the "circumstantial evidence . . . [did] not support a finding that the murder was committed with premeditation" [Doc. 2 p. 1–2]. Petitioner also alleges in her memorandum that her counsel could have established that she "suffered from **Battered Women's Syndrome**" by presenting additional witnesses and/or asking Tara Richardson about abuse Petitioner suffered [*Id.* at 2] (emphasis in original).

But while Petitioner asserts that she killed the victim in self-defense, substantial circumstantial evidence at Petitioner's trial suggested that she killed the victim while he was asleep, as the TCCA correctly noted. And this Court will not reweigh the evidence.

14

Moreover, the evidence was sufficient to allow the jury to reasonably find that Petitioner premeditated killing the victim, based on the relevant considerations for finding premeditation under Tennessee law. *See Smith I*, at *6 (citations omitted). Specifically, the evidence showed that Petitioner procured and used two guns to kill the victim in a cruel manner, as (1) she shot the sleeping victim in the head five times with two separate guns, one of which was loaded with hollow tip bullets, a fact about which she laughed during a recorded jail phone call; and (2) any one of the five shots to the victim's head would have killed him. Additionally, evidence at Petitioner's trial demonstrated that that she attempted to conceal or destroy evidence of the killing and/or her role in the killing, including but not limited to: (1) disposing of the guns she used to shoot the victim by throwing them out on the side of the road in a bag; (2) calling the victim's work and lying about his whereabouts; (3) expressing anger at her grandmother for telling the police about her confession to the killing and threatening that her grandmother should change her story; and (4) expressing her intent to lie to get the first-degree murder charge against her reduced.

And while Petitioner claims that she acted as "a Battered Woman" in killing the victim and the record shows that the jury heard some evidence that the victim had used physical force against her, it is apparent that the jury did not consider this evidence sufficient to rebut the evidence of her premeditation in killing the victim. Again, this Court will not reweigh the evidence. Additionally, Petitioner's assertion that her trial counsel should have presented more evidence that the victim had abused her at trial is not relevant to whether the evidence was sufficient to support her conviction, but rather relates to the effectiveness of her trial counsel. Thus, the Court will address that allegation below, with Petitioner's other ineffective assistance of counsel claims.

Accordingly, the TCCA properly applied *Jackson* to determine that the evidence was sufficient to support Petitioner's first-degree murder conviction under Tennessee law. Petitioner

has not met her heavy burden to establish that the TCCA's denial of her claim challenging the sufficiency of the evidence to support her first-degree murder conviction was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and she is not entitled to habeas corpus relief for this claim.

### B. Admission of Jail Phone Calls and Letters

Petitioner next challenges the trial court's admission of her jail phone calls and letters, specifically arguing that (1) a court should not admit evidence of pretrial detainee's conversations with her attorney as evidence against her in a criminal proceeding; (2) the admission of her jail phone calls as evidence violated Tennessee's Wiretapping and Electronic Surveillance Act; (3) the calls and letters were not probative of her mental state, did not make any admission, and were "blatant hearsay;" (4) the admission of her phone calls violated her 5th, 6th, 8th, and 14th Amendment rights, as set forth in *Massiah v. United States*, 377 U.S. 201 (1964); (5) the monitoring of her jail phone calls violated her First Amendment rights, and the seizure and disclosure of her letters violated her rights under the First and Fourth Amendments; and (6) the admission of the letters was error under the Tennessee Rules of Evidence [Doc. 1 p. 6; Doc. 2 p. 3–5]. The Court will set forth the TCCA's analysis of Petitioner's claim challenging the admission of this evidence before addressing these arguments.

### i. TCCA Analysis

The TCCA addressed Petitioner's claim challenging the trial court's admission of her jail letters and phone calls as follows:

> At a pretrial hearing, defense counsel stated that he intended to file a motion seeking to exclude from evidence the phone calls that [Petitioner] had made from jail. Defense counsel stated, "I can't really complain about the ones [the Assistant District Attorney] selected," but that he would file a motion to preserve his objection "in case the law ever changes." The trial court noted that the phone calls were statements that [Petitioner] had made, and they appeared to be admissible.

16

Defense counsel objected to the foul language used in the calls. [Petitioner] later filed a "Motion to Preclude Use of Telephone Calls" obtained while [Petitioner] was incarcerated. In the motion, defense counsel argued that [Petitioner] had an expectation of privacy and that the taping of the calls violated her Fourth Amendment right against illegal seizures and her First Amendment right to freedom of speech. [Petitioner] did not cite any case law supporting her arguments in the motion.

At a subsequent hearing, defense counsel objected to the introduction of the phone calls. He acknowledged that a detention facility can monitor calls for security purposes, but he stated that he did not want to waive the argument if the case law ever changed. The trial court denied [Petitioner]'s motion, ruling that the calls were admissible because they were voluntarily made by [Petitioner] and incriminating.

In her motion for new trial, [Petitioner] claimed for the first time that the recording of her phone calls from jail violates Tennessee's wiretapping statute. In denying [Petitioner]'s motion for new trial, the trial court found that [Petitioner] had no expectation of privacy as she was told that the call would be recorded. The State asserts that [Petitioner] has waived this issue because she did not raise it at trial. *See* Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

Nevertheless, we conclude that the recordings were lawfully intercepted. Tennessee Code Annotated § 40–6–302(b) provides that "[t]he interception of wire, oral or electronic communications, ... when no party to the communications has consented to the interception, should be allowed only under compelling circumstances when authorized and supervised by a court of competent jurisdiction and upon a finding of probable cause." Tenn. Code Ann. § 40–6–302(b). The Act provides for certain exceptions:

> It is lawful under §§ 39–13–601—39–13–603 and title 40, chapter 6, part 3 for a person acting under the color of law to intercept a wire, oral or electronic communication, where the person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Tenn. Code Ann. § 39–13–601(b)(2).

At the beginning of each of [Petitioner]'s phone calls, a recorded voice informs both parties to the conversation that the call may be recorded at any time. Thus, [Petitioner] "implicitly consented to the interceptions by continuing with the call

after the recorded warning." *See State v. Ivan Charles Graves,* No. E2009–00009–CCA–R3–CD, 2011 WL 398024 at * 16 (Tenn. Crim. App. at Knoxville, filed Feb. 8, 2011), *perm. app. denied* (Tenn. May 27, 2011).

[Petitioner] also argues that the recorded phone calls constitute an illegal seizure in violation of the Fourth Amendment. Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and that any evidence discovered is subject to suppression. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "The interception of a conversation in which a person has a reasonable expectation of privacy constitutes a search within the meaning of the Fourth Amendment." *State v. Munn,* 56 S.W.3d 486, 494 (Tenn. 2001) (citing *Katz v. United States,* 389 U.S. 347, 353, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). To properly evaluate the issue under both our state and federal constitutions, we must determine "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *Id.* (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); *State v. Ross,* 49 S.W.3d 833, 839 (Tenn. 2001)).

Again, we agree with the trial court that [Petitioner] had no reasonable expectation of privacy. The recorded calls themselves establish that a recorded voice informed [Petitioner] and the recipient of the call that the call was being recorded. Furthermore, testimony at trial established that while in jail [Petitioner] was provided a personal identification number to use when placing the calls. Based on the evidence, we cannot conclude that [Petitioner] had any reasonable or legitimate expectation of privacy. Considering whether [Petitioner]'s subjective expectation of privacy is reasonable and justifiable as viewed by society as a whole, as this Court recently held, "we cannot agree that society would deem reasonable an expectation that calls placed from jail would remain private." *State v. Hill,* 333 S.W.3d 106, 126 (Tenn. Crim. App. 2010).

[Petitioner] also contends that the recorded phone calls violate her Sixth Amendment right to counsel pursuant to *Massiah v. United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). The State responds that [Petitioner] has waived this issue by failing to raise it pre-trial. See Tenn. R. App. P. 36(a). While [Petitioner] objected to the phone calls at trial, she did not do so on the basis of the Sixth Amendment. We have held that a defendant waives an issue when he changes theories from the trial court to the appellate court. *State v. Dooley,* 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000). Nevertheless, we will address the issue.

18

Under *Massiah,* once the Sixth Amendment right to counsel has attached, it guarantees the accused the right to rely on counsel as a "medium" between the accused and the State. 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). Thus, police may not deliberately elicit information from an accused unless his right to counsel is waived. In order to determine whether there has been a *Massiah* violation, a court must first determine (1) whether adversary proceedings had commenced; (2) whether the informant was a government agent; and (3) whether the agent "interrogated" the appellant within the meaning of *Massiah.* Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Sawyer,* 156 S.W.3d 531, 534 (Tenn. 2005) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)).

[Petitioner] argues that through the recording of inmate phone calls, "the state intentionally creates a situation likely to induce defendants into making statements that the state either uses for tactical purposes or to introduce as evidence in the case for which the right to counsel has arisen." We disagree. While [Petitioner] correctly asserts that an incarcerated individual retains his or her right to free speech, "First Amendment rights, like many other rights, are circumscribed in the prison setting." *Dobbins v. Tennessee Dept. of Correction,* No.2010–00009– COA–R3–CV, 2010 WL 4225822, at *5 (Tenn. Ct. App. Oct.25, 2010). Although [Petitioner] was required to use the jail phones, she was not induced to make any statements about the case. [Petitioner] is not entitled to relief on this issue.

Next, [Petitioner] asserts that the trial court erred by allowing the State to introduce into evidence portions of two different letters written by [Petitioner] while she was incarcerated awaiting trial.

At a pretrial hearing, [Petitioner] sought to suppress two letters written by [Petitioner] from jail. Defense counsel argued that the letter in which [Petitioner] wrote what the prosecutor called a "rap" song was prejudicial. Counsel acknowledged that mail sent from a jail may be monitored for security purposes but asserted that [Petitioner] had an expectation of privacy and that use of the letters, absent a compelling state interest, violated her constitutional rights to free speech and to be free from unreasonable searches and seizures under the First and Fourth Amendments. Counsel acknowledged that case law did not support his argument, but explained to the trial court that he was objecting to the admission of the letters in the event that the law ever changed.

19

The prosecutor argued that the first letter, dated February 5, 2007, was relevant under Tennessee Rule of Evidence 402 because it showed intent and premeditation in that [Petitioner] wrote about taking the victim's money and drugs and going to Miami or California. The prosecutor argued that the letter established that theft was Defendant's motive for killing the victim. [Petitioner] responded that [Petitioner] had not been charged with felony murder and that, according to the letter, the theft of the money appeared to be an afterthought. The trial court agreed with Defendant and excluded the letter because it referred to [Petitioner]'s prior bad acts.

During the trial, the State moved to introduce a portion of the February 5th letter, which the court had previously ruled was inadmissible, arguing that the letter would rebut testimony from [Petitioner]'s grandmother, Linda Estridge, that [Petitioner] was afraid of the victim and that she was a good person. [Petitioner] responded that the letter was prejudicial. The trial court ruled that the letter could be introduced because the issue of [Petitioner]'s good character had been raised by a witness for the defense. The portion of the letter that was admitted states:

> I'm a bad ass white girl posted on your block. When you see me coming through, I'll be slinging them rocks. Bitch, don't get me twisted because I ain't no fucking cop, and I've always got a stash of that perp in my socks. When I'm rollin' in the hood, I'll be on them 22s, and if you step up to me, I'll make your blood spill. Always what you think. I've got skills. They are just a little rusty.

As to the second letter that the State sought to introduce, which was dated February 21, 2007, the prosecutor argued that it was relevant to show [Petitioner]'s intent to fabricate a defense. The letter states:

> Things are not looking good for me. My lawyer said I'll be lucky to get second-degree because the bullets went in "Execution Style!" So I'm going to tell them some shit to get the "Heat of Passion Crime." Shit, ya know, a Bitch gotta do what a bitch gotta do to get back to her youngins. For example, I might say he slept w/ someone who had AIDS or something and he told me to deal with it! Wouldn't that make you made enough to kill? I know it would me!

Defense counsel objected to the letter as prejudicial and expressed concern about the portion of the letter that references him. The State agreed to redact that portion, and the trial court ruled that the letter could be introduced at trial. The parties stipulated that [Petitioner] wrote the letter.

On appeal, [Petitioner] asserts that the trial court erred in admitting the letters based on several provisions of our state and federal constitutions and several rules of evidence. We review a trial court's decisions about the admissibility of evidence for an abuse of discretion. *State v. Banks,* 271 S.W.3d 90, 116 (Tenn. 2008). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.* (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.,* 249 S.W.3d 346, 358 (Tenn. 2008)).

With regard to the constitutionality of the seizure of the letter, we agree with the trial court that [Petitioner] did not have a reasonable expectation of privacy. We will apply the two-part analysis articulated in *State v. Munn,* 56 S.W.3d 486, 494 (Tenn. 2001). While [Petitioner] may have had a subjective expectation of privacy in that the letter was intended for a particular individual (*see State v. Archie Vaughn Montague,* No. 02C01–9502–CC00044, 1996 WL 417663 (Tenn. Crim. App. at Jackson, filed July 26, 1996), perm. app. denied (Tenn. Jan. 27, 1997) (held there was no subjective expectation of privacy where the defendant left a suicide note in his jail cell), and, unlike the phone calls from jail, there is nothing in the record to establish that [Petitioner] was warned that the letter could be intercepted, we do not believe that society would recognize [Petitioner]'s expectation of privacy as reasonable. The Tennessee Supreme Court has determined that prisoners do not have a "reasonable or legitimate expectation of privacy" in the confines of a prison cell. *State v. Dulsworth,* 781 S.W.2d 277, 284 (Tenn. 1989) (citing *Hudson v. Palmer,* 468 U.S. 517, 525–526, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)).

As to the relevance of the evidence, Tennessee Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant and otherwise admissible evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,...." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) provides that evidence of other crimes or acts, although not admissible to prove the character of a person in order to show action in conformity with the character trait, may be admissible for other purposes. The trial court must determine in a jury-out hearing whether there is a material issue other than conduct conforming with the character trait, and must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b); *State v. West,* 844 S.W.2d 144, 149 (Tenn.1992). Generally, this rule is one of exclusion, but there are exceptions. *State v. Jones,* 15

S.W.3d 880, 894 (Tenn. Crim. App. 1999). The generally recognized exceptions to the rule allow evidence offered to prove motive, identity, intent, absence of mistake, opportunity, or a common scheme or plan. *Bunch v. State,* 605 S.W.2d 227, 229 (Tenn. 1980). Additionally, the State may be allowed to introduce evidence of a "pertinent" character trait of the defendant when the defendant "opens the door" by introducing evidence of his or her good character. See Tenn. R. Evid. 404(a)(1).

In the February 21st letter, [Petitioner] stated that she was going to lie in order to establish that she committed the offense in the heat of passion rather than, as the State alleged, with premeditation. We believe this evidence is relevant to the issue of [Petitioner]'s intent. [Petitioner] has not established how this evidence is more prejudicial than probative to [Petitioner]'s intent.

As to the February 5th letter, the State asserts that [Petitioner] opened the door to presentation of rebuttal character evidence when Ms. Estridge testified that [Petitioner] was a "good girl" and that the victim had been physically abusive towards [Petitioner]. [Petitioner]'s probation officer, Tara Richardson, also testified for the defense that [Petitioner] was afraid of the victim. We agree with the State that the letter was relevant to rebut testimony that [Petitioner] was a "good girl" and a victim of abuse.

The trial court did not abuse its discretion by admitting the letters into evidence. [Petitioner] is not entitled to relief on this issue.

*Smith I*, at *7–12.

### ii. Conversations with Attorney

First, Petitioner argues in her petition that pretrial detainees' conversations with their attorneys should not be used against them at trial [Doc. 1 p. 6]. But she did not raise such a claim with the TCCA and therefore procedurally defaulted it, and she has set forth no reason for the Court to excuse that default.

Nevertheless, this claim has no merit as Petitioner does not allege, and the record does not show, that the trial court admitted evidence of her communications with her attorney. Rather, it admitted evidence of her phone calls and letters to non-attorneys and redacted her reference to her attorney from one such letter. Thus, Petitioner is not entitled to relief under § 2254 for this claim.

22

### iii. First and Fourth Amendments

Petitioner next claims that the monitoring of her jail phone calls violated her First Amendment rights, and that the seizure and admission of her jail letters violated her First and Fourth Amendment rights. But while it is apparent that Petitioner objects to jail officials monitoring her phone calls and using the information obtained from that monitoring against her, she does not explain how the monitoring of her jail phone calls and/or letters abridged her right to freedom of speech under the First Amendment, and the Court cannot logically infer that it did so. To the contrary, it is apparent that Petitioner's jail phone calls and letters represent her exercising her freedom of speech under the First Amendment, rather than any abridgment of that right. And nothing in the record suggests that anything kept Petitioner from exercising her right to freedom of speech. Thus, these assertions have no merit.

Additionally, Petitioner's claim that the seizure and admission of these letters violated her Fourth Amendment rights is not cognizable in this action, as she fully and fairly utilized the procedures for bringing such a claim under Tennessee law. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. However, "[b]ecause questions regarding the admissibility of otherwise relevant evidence seldom touch upon the "basic justice" of a conviction, the Supreme Court bars Fourth Amendment claims from habeas review." *Northrop v. Trippett*, 265 F.3d 372, 378 (6th Cir. 2001). Thus, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). As the record establishes that Petitioner fully and fairly exhausted her claim that admission of her jail

calls and letters violated her Fourth Amendment rights in her underlying proceedings with the state courts, she cannot bring this claim in this action, and the Court will not address it on the merits.

### iv. *Massiah*

Next, Petitioner's allegation that the trial court's admissions of her jail phone calls violated her constitutional rights based on *Massiah v. United States*, 377 U.S. 201, 206 (1964) also has no merit. As the TCCA correctly noted, in *Massiah* the Supreme Court held that government agents violate a criminal defendant's Sixth Amendment rights when they directly elicit incriminating evidence in the absence of counsel and introduce this evidence at trial. *Massiah*, 377 U.S. at 206. But this premise is limited to "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). Thus, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks" to establish a *Massiah* violation. *Id.* (quoting *Maine v. Moulton*, 474 U.S. 159, 176 (1985)).

Petitioner points to no evidence that police took any action to elicit the content of her phone calls. Accordingly, Petitioner has not met her burden to establish that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and she is not entitled to relief for this claim.

### v. State Law Claims

The remainder of Petitioner's assertions regarding her jail phone calls and letters allege violations of state law. But such claims are not cognizable under § 2254. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus").

Moreover, even if the Court could find that Petitioner's remaining claims regarding her jail phone calls and letters were cognizable under § 2254, she has not established that the TCCA's denial of the claims was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and therefore she is not entitled to § 2254 relief.

### C. Ineffective Assistance of Counsel

In her § 2254 petition, Petitioner asserts that her trial counsel was ineffective for:

(1)     Failing to investigate and present evidence of Petitioner's mental health issues at the time of the offense;

(2)     Failing "to withdraw after he became a witness at trial";

(3)     Failing "to plan a proper defense";

(4)     Failing "to investigate and present evidence" of Petitioner's intoxication at the time of the offense; and

(5)     Failing to present evidence that the victim abused her.

[Doc. 1 p. 7–8; Doc. 2 p. 2, 5–10].  Petitioner additionally claims that her appellate counsel was ineffective for not filing a Rule 11 application to appeal the TCCA's opinion affirming her conviction and the denial of her ineffective assistance of counsel claims with the TSC, not telling he that he did not intend to do so, and not withdrawing from her case [Doc. 1 p. 7; Doc. 2 p. 8]. Petitioner also asserts that the cumulative effect of her counsels' errors entitles her to relief [Doc. 2 p. 10].  The Court will address each of Petitioner's ineffective assistance of counsel claims in turn, after setting forth the applicable standard of review.

### i. Standard of Review

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for h[er] defense."  U.S. Const. amend. VI.  This includes the right to "reasonably effective assistance" of counsel.  *Strickland v.*

25

*Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Supreme Court set forth a two-pronged

test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose result
> is reliable.  Unless a defendant makes both showings, it cannot be
> said that the conviction . . . resulted from a breakdown in the
> adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  A petitioner has the burden of proving ineffective assistance of her

counsel.  *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney

performance is "reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688.

A party asserting an ineffective-assistance-of-counsel claim must "identify the acts or omissions

of counsel that are alleged not to have been the result of reasonable professional judgment."  *Id.* at

690.  The evaluation of the objective reasonableness of counsel's performance must be made "from

counsel's perspective at the time of the alleged error and in light of all the circumstances, and the

standard of review is highly deferential."  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient

performance prejudiced the defense.  Thus, "[a]n error by counsel, even if professionally

unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had

no effect on the judgment."  *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim

for ineffective assistance of counsel to meet her burden, and if either prong is not satisfied, the

claim must be rejected.  *Strickland*, 466 U.S. at 69.  Moreover, a habeas petitioner alleging

26

ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### ii. Mental Health

Petitioner first claims that her trial counsel failed to investigate and present evidence of her mental health issues at the time of the offense [Doc. 1 p. 7; Doc. 2 p. 6]. The TCCA denied this claim by stating as follows:

> [Petitioner]'s trial counsel testified that he did not observe any behaviors or signs of mental illness in his meetings with [Petitioner]. He described [Petitioner] as "very in control." Dr. Smith's evaluation of [Petitioner] showed that [Petitioner] had exaggerated her symptoms, and in one of [Petitioner]'s letters, she wrote that she was going to lie about her symptoms in order to obtain medication.

> Furthermore, [Petitioner] has not shown that evidence of her mental state would have been admissible at trial. Ordinarily, expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." *State v. Hall,* 958 S.W.2d 679, 689 (Tenn.1997). Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. *State v. Phipps,* 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). Interpreting the supreme court's holding in *Hall,* this Court has held that, in order for expert testimony regarding a defendant's mental state to be admissible, "the expert must testify that (1) the defendant has a mental disease or defect and that (2) because of the mental disease or defect, the defendant lacks the capacity to form the requisite mens rea." *State v. Anthony Poole,* No. W2007–00447–CCA–R3–CD, 2009 WL 1025868, at *9 (Tenn. Crim. App. at Jackson, filed April 14, 2009), perm. app. denied (Tenn. Sept. 28, 2009) (citing *Hall,* 958 S.W.2d at 689–91).

> In *State v. Faulkner,* 154 S.W.3d 48 (Tenn. 2005), our supreme court affirmed the trial court's decision to exclude expert testimony where the doctor would have testified that the defendant suffered from a reduced ability to premeditate at the time of the crime. *Id.* at 56. In that case, the supreme court held that the expert's proposed testimony did not meet the prerequisites of *Hall* because the doctor could not testify that the defendant was incapable of intentional and premeditated action. Similarly, relying on *Faulkner* and *Hall,* this Court held that an expert's testimony was inadmissible "because [the expert] did not testify that the appellee completely

lacked the mental capacity to commit the crimes...."  *State v. Antonio D. Idellfonso–Diaz,* No. M2006–00203–CCA–R9–CD, 2006 WL 3093207 at *4 (Tenn. Crim. App. at Nashville, filed Nov. 1, 2006), perm. app. denied (Tenn. Feb. 26, 2007).

> In this case, Dr. Smith acknowledged that she could not conclude that [Petitioner] lacked the ability to premeditate or form the requisite intent to commit the crime. She testified, "[t]he best I can do is say that [sic] what I said in my report which is 'could have.'"  Based on Dr. Smith's testimony at the hearing on [Petitioner]'s motion for new trial, we conclude that trial counsel was not deficient for failing to present evidence of [Petitioner]'s mental state as a defense.

*Smith I,* at *14.

The TCCA properly found that Petitioner is not entitled to relief for this claim.  In her petition, Petitioner claims that her trial counsel was deficient for not obtaining a psychological examination of her, and that the testimony of Attorney Logan at the hearing on her motion for new trial supports this assertion [Doc. 2 p. 6].  But Petitioner's trial counsel testified that "it never dawned on [him] that mental health was an issue [] in this case," and that Petitioner "was very in control" and "not emotional and not exhibiting any mental health issues" [Doc. 11-7 p. 37].  While Attorney Logan had a different impression of Petitioner, this later impression of Petitioner has no bearing on whether Petitioner's trial counsel had notice of any issues with Petitioner's mental health.

Moreover, the only evidence Petitioner presented regarding her mental health at the time of the offense came from Dr. Smith, who found that Petitioner exaggerated her mental health complaints and symptoms, and whose testimony would not have been admissible at trial under Tennessee law.  Thus, Petitioner has not presented evidence of her mental state at the time of the offense that had a reasonable probability of changing the result of her trial, as required to establish an ineffective assistance of counsel claim under *Strickland*.

Accordingly, Petitioner has not established that her trial counsel's failure to obtain a psychological examination of her was deficient performance that caused her prejudice, or that the

TCCA's denial of this claim was based on an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. As such, she is not entitled to relief under § 2254 for this claim.

### iii. Failure to Withdraw

Petitioner further asserts that trial counsel was ineffective for not withdrawing after he became a witness at her trial [Doc. 1 p. 7; Doc. 2 p. 7]. The TCCA addressed this claim as follows:

Next, [Petitioner] contends that trial counsel was deficient for not withdrawing as counsel when the State sought to introduce a letter written by [Petitioner] that referenced counsel. Trial counsel testified that he attempted to exclude all of the letters written by [Petitioner] because they were incriminating. However, the trial court allowed into evidence a letter written by [Petitioner] that states:

Kendrick,

What the business is Baby? I'm so glad to hear from you, and Congratulations, Daddy. I know a baby from you will Be Beautiful. On a serious tip baby be thankful you only have 2 y[ea]rs. It seems like a long time but in all actuality it's not, your seed will still be young enough for you to raise the right way and you'll still be young enough to get your shit strait! Things are not looking good for me. [*My lawyer says*] I'll be lucky to get 2nd degree because one of the bullets went in "Execution Style!" So I'm going to tell them some shit to get the "Heat of Passion Crime." Shit ya know a Bitch gotta do what a Bitch gotta do to get back to her youngins. For example, I might say he slept w[ith] someone who had AIDS or something and he told me to deal with it! Wouldn't that make you mad enough 2 kill? I know it would me! I don't know yet so please keep me and my 4 babies in your prayers.

In the margin of the letter, [Petitioner] bracketed the portion of the letter in which she wrote about fabricating a defense and wrote, "Erase this part or just throw this page away." The trial court redacted [Petitioner]'s reference to trial counsel because, as trial counsel asserted, it would have put him in the position of being a possible witness. By redacting only the portion of the letter that states, "[m]y lawyer says," we believe the letter may give the impression that [Petitioner] was admitting in the letter that she had killed the victim "execution style," and therefore, would have been "lucky" to get a conviction for second degree murder. However, [Petitioner] cannot, and does not, assert that trial counsel was ineffective for not

29

seeking to exclude the entire letter because counsel did attempt to suppress the letter prior to trial. Rather, [Petitioner] asserts that trial counsel was ineffective for not moving to withdraw as counsel.

Even assuming arguendo that counsel was deficient for failing to withdraw as counsel, [Petitioner] has failed to show how she was prejudiced by counsel's alleged deficiency. [Petitioner]'s new counsel at the hearing on the motion for new trial did not elicit any testimony from trial counsel or present any other proof that would tend to show that 1) had trial counsel filed a motion to withdraw as counsel, the trial court would have granted the motion; or 2) had the motion to withdraw been granted, what trial counsel would have testified to had he been called as a witness at the trial. In order to show prejudice that justifies relief, a defendant must do more than have the court rely on speculation. *See e.g. Joseph DeJuan Webster v. State,* No. M2009–01540–CCA–R3–PC, 2010 WL 2594028 (Tenn. Crim. App. at Nashville, June 28, 2010), *perm. app. denied* (Tenn., Nov. 10, 2010). In cases such as this, there should be some evidence of what would have been submitted as proof at trial if, in fact, trial counsel had rendered effective assistance of counsel.

[Petitioner] has failed to show prejudice by trial counsel's failure to withdraw. A defendant's "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." *Goad v. State,* 938 S.W.2d 363, 370 (Tenn.1996) (citing *Strickland,* 466 U.S. at 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674).

*Smith I*, at *15–16.

The Court agrees with the TCCA that Petitioner is not entitled to relief for this claim. In her § 2254 petition, Petitioner contends that Attorney James Logan's testimony that her counsel should have withdrawn, rather than allow the statement in the letter referring to the bullets going in execution style to be attributed to Petitioner, and that the prejudice resulting from his decision not to do so "was enormous," establishes that she is entitled to relief for this claim [Doc. 2 p. 7]. But even if the Court takes this argument to its logical end and assumes that the trial court would have allowed Petitioner's counsel to withdraw, and then would have admitted Petitioner's relevant letter into evidence without redacting the "my lawyer said" language, the Court does not find that

30

this would establish a reasonable probability that the result of Petitioner's trial would have been different, in light of the substantial evidence of Petitioner's guilt and premeditation introduced at trial. And notably, such evidence includes but is not limited to the second part of Petitioner's same letter, in which she indicated her intent to come up with a lie to support a "'[h]eat of [p]assion'" defense to avoid a conviction for first-degree murder.

As such, Petitioner has not established that her counsel's failure to withdraw prejudiced her, or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and she is not entitled to relief under § 2254 for this claim.

### iv. **Appellate Counsel**

Petitioner next claims that her appellate counsel was ineffective for not filing a Rule 11 application to appeal the TCCA's opinion affirming her conviction and denying her claims for ineffective assistance of counsel with the TSC, not notifying he that he did not intend to do so, and not withdrawing from her case [Doc. 1 p. 7; Doc. 2 p. 8]. But after Petitioner raised this issue in her post-conviction proceeding, the trial court granted her a delayed Rule 11 appeal [Doc. 11-21 at 33–34]. And after Petitioner filed that Rule 11 appeal [Docs. 11-18, 11-19], the Tennessee Supreme Court declined review [Doc. 11-20]. Thus, as she received post-conviction relief for this claim, Petitioner did not raise it in her appeal to the TCCA of the denial of her petition for post-conviction relief [Doc. 11-24], and the claim appears to be both procedurally defaulted and moot.

But regardless of mootness and/or any procedural default of this claim, as Petitioner received a delayed Rule 11 appeal, she cannot establish that her appellate counsel's alleged ineffectiveness with regard to filing that appeal her prejudiced her in any way, as *Strickland* requires. Thus, Petitioner is not entitled to habeas corpus relief for this claim.

### v. Intoxication

Petitioner also claims that her counsel was ineffective for "failing to explore, investigate[,] and present evidence regarding Petitioner's intoxicated state" at the time of the offense [Doc. 1 p. 7; Doc. 2 p. 9]. Petitioner raised this claim with the TCCA, which denied it by stating as follows:

> We also conclude that defense counsel was not deficient for failing to assert intoxication as a defense. At the hearing on [Petitioner]'s motion for new trial, trial counsel testified that the only witness to testify at trial that [Petitioner] had been using crack cocaine at the time of the offense was [Petitioner]'s mother, Sherry Agee. While another witness, Julie Campbell[,] testified that she and [Petitioner] got high on crack cocaine after the shooting, as trial counsel testified, the only other witness who could have testified as to [Petitioner]'s drug use prior to or at the time of the shooting was [Petitioner] herself. Moreover, [Petitioner] did not present any evidence at the motion for new trial hearing in support of [Petitioner]'s intoxication.

*Smith I*, at *15.

The TCCA properly determined that Petitioner is not entitled to relief for this claim. In her memorandum in support of her § 2254 petition, Petitioner asserts that Attorney James Logan's testimony at the hearing on her motion for new trial supports her claim that counsel was defective for not presenting the defense of intoxication "even though such proof was readily available," and notes that her counsel did not consult with an addiction expert or request a jury instruction for voluntary intoxication [Doc. 2 p. 9]. However, while evidence at Petitioner's trial established that Petitioner had smoked crack with her mother in the hours before the murder, Petitioner points to no evidence from the trial court record that she was intoxicated at the time of the murder, nor did the Court locate any such evidence. Further, as the TCCA correctly noted, Petitioner did not present evidence of her intoxication at the hearing on her motion for new trial, nor did she establish that any such evidence "was readily available" to her trial counsel. This Court will not speculate about the existence of any such evidence. Moreover, Petitioner likewise has never presented

evidence of any addiction issues, such that the Court could find that her counsel was ineffective for not doing consulting with an expert regarding such issues.

As such, Petitioner has not established that her counsel was deficient with regard to presenting a defense of intoxication, or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Thus, she is not entitled to relief under § 2254 for this claim.

### vi. Proper Defense

Petitioner next claims that her counsel was ineffective because he did not plan a proper defense for her trial [Doc. 1 p. 7; Doc. 2 p. 8]. The TCCA stated as follows in denying this claim:

> Finally, we conclude that trial counsel was not deficient for, as [Petitioner] generally asserts, failing to adequately develop "a theme, plan, or theory of defense" at trial. The trial court found that trial counsel represented [Petitioner] to the best of his ability given the facts of the case. We agree. Trial counsel testified that he investigated the case, conferred with [Petitioner], interviewed several witnesses, and developed different theories and defenses; however, those defenses were either not supported by the evidence or were negated by [Petitioner] herself in her letters and phone calls. Furthermore, other than [Petitioner]'s mental state and intoxication, which we addressed above, [Petitioner] did not suggest or present evidence of any additional theories or defenses at the motion for new trial hearing. [Petitioner] is not entitled to relief on this issue.

*Smith I*, at *16.

Again, the TCCA properly found that Petitioner is not entitled to relief. In her petition, Petitioner claims that trial counsel "failed to investigate, develop[,] and present evidence regarding" her mental health and addiction issues and her intoxication, and that "[t]he cumulative effect of trial counsel failing to present a cogent and cohesive defense resulted in great prejudice to [Petitioner]. Trial counsel failed to investigate the facts of this case" [Doc. 2 p. 8]. However, Petitioner presents claims regarding trial counsel's failure to present defenses based on her mental health and intoxication separately in her § 2254 petition, and the Court has already found that they

33

do not have merit. Moreover, Petitioner points to no proof in the record that her trial counsel unreasonably failed to investigate any element of the case against her, as she must do to be entitled to habeas corpus relief for such a claim. *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010). And the record fully supports the holdings of the TCCA and the trial court that Petitioner's counsel represented her as well as he could under the circumstances of her case.

As such, Petitioner has not established that her counsel was deficient with regard to presenting a defense at trial, or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Thus, she is not entitled to relief under § 2254 for this claim.

### vii. Evidence of Abuse

As set forth above, Petitioner also claims that her counsel was ineffective for not presenting evidence of the victim abusing her to establish that she had "Battered Women's Syndrome" and specifically claims that "other witnesses, including [] Petitioner's probation officer, Tara Richardson, [] could have testified regarding the abuse Petitioner had endured from the victim" [Doc. 2 p. 2].

However, Petitioner did not exhaust any such ineffective assistance of claim with the TCCA [Doc. 11-14], nor has she pled cause and prejudice to excuse this procedural default. Moreover, as the TCCA noted in its opinion, Tara Richardson testified at Petitioner's trial that she was aware of the victim committing a domestic assault against Petitioner, that Petitioner was afraid of the victim, and that the victim had abused Petitioner while she was pregnant. *Smith I*, at *3. And Petitioner has never presented additional evidence of the victim abusing her from Tara Richardson or any other witnesses, such that the Court could find that Petitioner's trial counsel

was deficient for not presenting that evidence, or that any such deficiency prejudiced her. Thus, Petitioner is not entitled to relief under § 2254 for this claim.

### viii.  Cumulative Effect

In her memorandum in support of her § 2254 petition, Petitioner also claims that "the cumulative effect of counsel's errors seriously affected the entire adversary process and [] but for counsel's incompetence there is a reasonable probability that the outcome would have been different" [Doc. 2 p. 10].  While Petitioner generally raised this argument in her appeal to the TCCA [Doc. 11-14 p. 43], the TCCA did not address it in its opinion.  *Smith I.*

But "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) (citing *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)).  Moreover, the Court has not found that any of Petitioner's ineffective-assistance-of-counsel claims have any merit, and where "individual claims are all essentially meritless, [a petitioner] cannot show that the cumulative error[s] violated his constitutional rights."  *Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (citing *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)).  Accordingly, Petitioner is not entitled to relief under § 2254 on this claim.

### D.  Trial Judge Misbehavior

Petitioner's last claim for habeas corpus relief is that her trial judge's improper actions both during and outside of her trial violated her right to a fair and impartial trial [Doc. 1 p. 8–9; Doc. 2 p. 10–11].  Petitioner raised these claims in her post-conviction proceedings.  Specifically, in the original pro se petition for post-conviction relief that Petitioner filed in the state court, she presented a claim challenging the trial judge's behavior outside of her trial [Doc. 11-21 p. 7–13].  Then, through counsel, she later filed an amendment to that petition alleging that her trial judge's

in-trial behavior created a structural error that entitled her to post-conviction relief [*Id.* at 26–31]. The post-conviction court dismissed the petition, specifically finding that Petitioner had waived any claim of structural error in her trial by not raising it earlier [*Id.* at 41–43]. Petitioner appealed this dismissal to the TCCA [Doc. 11-24], which (1) construed Petitioner's appellate brief to challenge "the trial judge's 'in-court misconduct' and [to allege that] the trial judge was unable to act in his capacity as the thirteenth juror due to his out-of-court drug use;" (2) found that Petitioner had waived these arguments by failing to raise them in her Rule 11 appeal; and (3) affirmed the dismissal of Petitioner's post-conviction petition. *See generally Smith II*.

Respondent argues that the TCCA's affirmance of the post-conviction court's dismissal of this claim as waived establishes that Petitioner procedurally defaulted it, and that this precludes this Court from addressing the merits of this claim. The Court agrees.

Specifically, as set forth above, in affirming the post-conviction court's dismissal of Petitioner's petition for post-conviction relief, the TCCA found that Petitioner had waived her claim challenging the trial judge's in-court behavior and ability to act as thirteenth juror by not raising it in her Rule 11 petition for review by the TSC even though she could have done so. *Smith II*, at *2–3. The TCCA cited Tenn. Code Ann. § 40-30-106(g)[1] to support this ruling. *Id.* This statutory subpart provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented" and sets forth two exceptions to this rule that are not relevant here. Tenn. Code Ann. § 40-30-106(g).

---

[1] The TCCA's opinion actually cited Tenn. Code Ann. § 40-30-105(g). *Smith II*, at *2–3. But it is clear that this was a typographical error, as the opinion quoted language directly from Tenn. Code Ann. § 40-30-106(g). *Id.* Thus, the Court cites Tenn. Code Ann. § 40-30-106(g).

36

Tenn. Code Ann. § 40-30-106(g) is a firmly established and regularly enforced independent rule that prevents this Court from reviewing the instant claim. *See, e.g., Cone v. Bell*, 243 F.3d 961, 969 (6th Cir. 2001), *overruled on other grounds by Bell v. Cone*, 535 U.S. 685 (2002) (finding Tennessee's waiver statute to be independent and adequate state rule that is regularly enforced); *Ralph v. Sexton*, No. 4:13-CV-53-HSM-SKL, 2016 WL 4574682, at *10 (E.D. Tenn. Sept. 1, 2016) (finding Tenn. Code Ann. § 40-30-106(g) "an adequate and independent state ground sufficient to foreclose habeas review"); *Holland v. State*, 610 S.W.3d 450, 457–60 (Tenn. 2020) (citing and applying Tenn. Code Ann. § 40-30-106(g) in reversing the TCCA's decision to *sua sponte* raise a claim that the post-conviction petitioner had failed to raise in earlier proceedings); *Stanhope v. State*, 2018 WL 1884656 (Tenn. Crim. App. Apr. 19, 2018) (applying Tenn. Code Ann. § 40-30-106(g) to find that a post-conviction petitioner waived a claim by failing to present it in earlier proceedings and citing various cases likewise finding that post-conviction petitioners waived claims by not raising them in earlier proceedings where they could have done so).

Accordingly, to the extent that Petitioner raises the same claim regarding her trial judge's misconduct that she presented to the TCCA in her appeal of the dismissal of her post-conviction petition, the TCCA based its rejection of this claim on this state law rule that is both independent of the federal question and adequate to support the judgment, and Petitioner therefore procedurally defaulted this claim. *Walker v. Martin*, 562 U.S. 307, 315 (2011). And as Petitioner has not alleged or shown cause and prejudice to excuse that default, or that a fundamental miscarriage of justice would result from a failure to consider this claim, this Court will not address this claim on the merits.

Additionally, to the extent that Petitioner's § 2254 petition could be construed to raise other claims arising out of the trial judge's out of court misconduct that Petitioner did not raise to the

TCCA in her appeal of the dismissal of her petition for post-conviction relief, Petitioner procedurally defaulted those claims by not raising them with the TCCA, and she has not set forth any grounds to excuse this procedural default. Thus, the Court will not address any such claims on the merits.

V.     **CONCLUSION**

For the reasons set forth above, Petitioner's requests for § 2254 relief will be **DENIED**, and this action will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may issue only where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

Reasonable jurists would not debate the Court's finding that Petitioner procedurally defaulted her claim(s) arising out of her trial judge's misconduct or her unexhausted ineffective assistance of counsel claims. Further, reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right with regard to her claims

challenging the sufficiency of the evidence, the admission of her jail phone calls and letters, or her exhausted ineffective assistance of counsel claims, such that they would be adequate to deserve further review. Accordingly, a **COA SHALL NOT ISSUE.** Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

ENTER:


_____
        s/ Leon Jordan
United States District Judge